No. 17-2002 (L)
_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

BRIAN DAVISON,

*Plaintiff-Appellee*,

v.

PHYLLIS RANDALL,

*Defendant-Appellant*.

_____

On appeal from the United States District Court
for the Eastern District of Virginia at Alexandria,
Case No. 1:16-cv-00932-JCC-IDD

---

**DEFENDANT-APPELLANT PHYLLIS J. RANDALL'S
INFORMAL OPENING BRIEF**

---

Scott E. Gant
Aaron E. Nathan
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
(202) 237-2727
sgant@bsfllp.com

*Counsel for Defendant-Appellant
Phyllis J. Randall*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  17-2002L          Caption:  Davison v. Randall  (Nos. 17-2002 & 17-2003)

Pursuant to FRAP 26.1 and Local Rule 26.1,

Phyllis Randall
(name of party/amicus)

who is _____Defendant-Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                         ☐ YES ☑ NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                            ☐ YES ☑ NO
        If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
       If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐ YES ☑ NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?                          ☐ YES ☑ NO
       If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Scott E. Gant                              Date: ___November 3, 2017___

Counsel for: Phyllis Randall

# CERTIFICATE OF SERVICE
**************************

I certify that on ___November 3, 2017___ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

/s/ Scott E. Gant                                          November 3, 2017
(signature)                                                (date)

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................. 1

ISSUES ........................................................................................... 2

ARGUMENT .................................................................................... 3

   I.   Standard of Review ................................................................. 3

   II.  Randall Did Not Act "Under Color of State Law" ...................... 3

   III.  Randall Did Not Violate the First Amendment or
       Article I, § 12 ......................................................................... 6

      A.  Randall's Facebook Page Is Not a "Public Forum" ............. 7

      B.  The 12-Hour "Ban" Was Not "Viewpoint
          Discrimination" ................................................................ 11

      C.  "Virginia SGP"—Not Plaintiff—Was Temporarily
          Banned ............................................................................ 13

      D.  Any First Amendment Impact Was *De Minimis*
          and Not Actionable ......................................................... 14

      E.  The District Court Paid Insufficient Attention to
          Randall's First Amendment Rights .................................. 15

      F.  If Randall's Actions Were State Actions, Then Her
          Facebook Page Is Government Speech Immune
          From First Amendment Scrutiny ..................................... 17

   IV.  The District Court Erred in Granting Declaratory Relief ........... 18

      A.  To the Extent the Declaratory Judgment Operates
          Prospectively, It Must Be Reversed Because There
          Was No "Actual Controversy" Necessary For the
          District Court's Jurisdiction ............................................ 18

B.  To the Extent the Declaratory Judgment Operates
    Retrospectively, It Must Be Reversed Because
    Randall Is Entitled to Qualified Immunity.........................................21

STATEMENT REGARDING FORMAL BRIEFING AND
ORAL ARGUMENT ....................................................................................24

CONCLUSION .................................................................................................25

## TABLE OF AUTHORITIES

**CASES**                                                                 **Page(s)**

*Aetna Life Ins. Co. v. Haworth,*
    300 U.S. 227 (1937)................................................................19

*California Dep't of Corr. v. Morales,*
    514 U.S. 499 (1995)................................................................23

*CGM, LLC v. BellSouth Telecomms., Inc.,*
    664 F.3d 46 (4th Cir. 2011) ............................................ 21, 23

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983)................................................................20

*Clapper v. Amnesty Int'l USA.,*
    568 U.S. 398 (2013)..............................................................20

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC,*
    518 U.S. 727 (1996)..............................................................9

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000)..............................................................19

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006)..............................................................16

*Green v. Mansour,*
    474 U.S. 64 (1985).................................................... 18, 21, 23

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982)........................................................ 22, 24

*Henry v. Purnell,*
    652 F.3d 524 (4th Cir. 2011) ...............................................21

*Helton v. AT & T Inc.,*
    709 F.3d 343 (4th Cir. 2013) .................................................3

*Ingraham v. Wright,*
    430 U.S. 651 (1977)..............................................................15

*International Soc. for Krishna Consciousness, Inc. v. Lee,*
  505 U.S. 672 (1992)..................................................................7

*Lefemine v. Wideman,*
  672 F.3d 292 (4th Cir. 2012) ................................................ 22, 23

*Lugar v. Edmondson Oil Co.,*
  457 U.S. 922 (1982)..................................................................5

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)................................................................19

*Manning v. S.C. Dep't of Highway & Pub. Transp.,*
  914 F.2d 44 (4th Cir. 1990) ..................................................23

*Miami Herald Pub. Co. v. Tornillo,*
  418 U.S. 241 (1974)................................................................16

*Minnesota State Bd. for Cmty. Colls. v. Knight,*
  465 U.S. 271 (1984)..................................................................7

*Mitchell v. Forsyth,*
  472 U.S. 511 (1985)................................................................24

*Packingham v. North Carolina,*
  137 S. Ct. 1730 (2017)..........................................................10

*Pennhurst State Sch. & Hosp. v. Halderman,*
  465 U.S. 89 (1984)................................................................24

*PeTA v. Rasmussen,*
  298 F.3d 1198 (10th Cir. 2002) ............................................18

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
  460 U.S. 37 (1983)..................................................................7

*Pulliam v. Allen,*
  466 U.S. 522 (1984)................................................................24

*Raub v. Campbell,*
  785 F.3d 876 (4th Cir. 2015) ................................................21

*Reichle v. Howards,*
566 U.S. 658 (2012)..................................................................22

*Roller v. Cavanaugh,*
984 F.2d 120 (4th Cir. 1993) .................................... 23, 24

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
515 U.S. 819 (1995)..................................................................11

*Rossignol v. Voorhaar,*
316 F.3d 516 (4th Cir. 2003) ...........................................5, 6

*Saucier v. Katz,*
533 U.S. 194 (2001)..................................................................21

*Skelly Oil Co. v. Phillips Petroleum Co.,*
339 U.S. 667 (1950)..................................................................19

*Baltimore Sun Co. v. Ehrlich,*
437 F.3d 410 (4th Cir. 2006) ...........................................15

*United Pub. Workers of Am. (C.I.O.) v. Mitchell,*
330 U.S. 75 (1947)...................................................................20

*United States v. Am. Library Ass'n, Inc.,*
539 U.S. 194 (2003)..................................................................10

*United States v. Classic,*
313 U.S. 299 (1941)...................................................................5

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,*
535 U.S. 635 (2002)......................................................... 18, 24

*Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.,*
386 F.3d 581 (4th Cir. 2004) ...........................................3

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
135 S. Ct. 2239 (2015)........................................................7, 17

*West v. Atkins,*
487 U.S. 42 (1988)...................................................................5

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ...................................................................16

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. amend. I ................................................... *passim*

U.S. Const. amend. XI ...............................................................21

28 U.S.C. § 2201 ............................................................... 19, 23

42 U.S.C. § 1983 .................................................................3, 6

Va. Const., art. I, § 12 ..........................................................2, 6

Va. Code § 15.2-1405 ............................................................22

## INTRODUCTION

This appeal concerns a declaratory judgment entered by the District Court in favor of Plaintiff, a citizen of Loudoun County, Virginia, against Phyllis J. Randall, Chair of the Loudoun County Board of Supervisors, in her individual capacity. Although the District Court rejected most of Plaintiff's claims either before or after trial, following a one-day bench trial the Court ruled in Plaintiff's favor with respect to the allegation that Randall violated the First Amendment by preventing comments from being posted—overnight, for "at most 12 hours"[1]—under Plaintiff's "screen name," Virginia SGP, to a Facebook page created and maintained by Randall.[2]

Following the May 16, 2017 bench trial, the District Court issued a Memorandum of Decision on July 25, 2017, setting out its factual findings and conclusions of law (Dkt. 132). Later that day, the Court issued a corresponding Order (Dkt. 133), and the next day the Clerk issued a Judgment (Dkt. 134) tracking the Order and Memorandum of Decision.

_____

[1] There is evidence that the period was shorter than 12 hours. *See* Trial Tr. at 195:2-195:3. And the evidence is clear that it lasted for no more than 12 hours. *See* Trial Tr. at 194:20-195:3; *see also* Memorandum of Decision ("Mem. of Dec.") at 13, Factual Finding 42 (ban "was relatively brief and spanned at most 12 hours"). However, for purposes of convenience only, this brief refers to the period in question as the "12-Hour period" or "12-Hour ban."

[2] Before the District Court, Randall's Facebook page was referred to as the "Chair Phyllis J. Randall page." Randall has two other Facebook pages—"Friends of Phyllis Randall," her "political page," and "Phyllis Randall," a "personal profile." *See* Trial Tr. 95:16-97:4; *id.* at 199:24-25. Only the "Chair Phyllis J. Randall page" is at issue here—and that page is referred to in this brief as Randall's "Facebook page."

1

While the District Court appropriately rejected Plaintiff's due process claims, his claim against Randall in her official capacity, and his claim for injunctive relief, the Court erred in numerous respects in its First Amendment analysis and decision to issue a declaratory judgment. For the reasons explained in more detail below, the District Court's Order and Judgment in favor of Plaintiff should be reversed, and Judgment on all issues should be entered for Randall.

## ISSUES[3]

1.     Did the District Court err in concluding that Randall "acted under color of state law" in maintaining her Facebook page and "banning Plaintiff from that page"? Memorandum of Decision ("Mem. of Dec.") at 1-2.

2.     Did the District Court err in concluding that Randall's actions violated the First Amendment of the United States Constitution and Article I, § 12 of the Constitution of Virginia? Mem. of Dec. at 2.

3.     Did the District Court err in concluding that a declaratory judgment "clarifying" that Randall's Facebook page "operates as a forum for speech under

---

[3] Plaintiff invoked the District Court's jurisdiction under 28 U.S.C. § 1331. The District Court issued a final order disposing of all of Plaintiff's claims on July 25, 2017, and the Clerk entered judgment on July 26, 2017. Plaintiff and Randall each filed Notices of Appeal on August 24, 2017. This Court's jurisdiction rests on 28 U.S.C. § 1291. After docketing each appeal on August 29, 2017, the Court consolidated the cases on August 30, 2017, and issued an informal briefing order requiring the parties to file informal opening briefs by September 25, 2017. On September 8, 2017, the Court extended the time to file the informal opening briefs to October 16, 2017. On September 26, 2017, the Court further extended the time to file the informal opening briefs to and including November 6, 2017.

the First Amendment and Constitution of Virginia [was] appropriate under the circumstances"?  Mem. of Dec. at 2.

4.    Did the District Court err in entering the parts of the Order and Judgment in favor of Plaintiff and against Randall?

## ARGUMENT

## I.    Standard of Review

"This Court reviews judgments stemming from a bench trial under a mixed standard: factual findings are reviewed for clear error, whereas conclusions of law are reviewed de novo."  *Helton v. AT & T Inc.*, 709 F.3d 343, 350 (4th Cir. 2013). And although this Court reviews a district court's decision to grant a declaratory judgment for abuse of discretion, it "review[s] *de novo* the issue of whether a district court possessed jurisdiction in a declaratory judgment proceeding."  *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 591 (4th Cir. 2004).

## II.    Randall Did Not Act "Under Color of State Law"

Because Plaintiff brought claims against Randall under 42 U.S.C. § 1983, the District Court's determinations, Order and Judgment all depended on the conclusion that Randall "acts under color of state law in maintaining her 'Chair Phyllis J. Randall' Facebook page as it is presently constituted."  Order at 1; Mem. of Dec. at 1-2.

3

The undisputed evidence showed:

- Randall's Facebook page was created before Randall took office;[4]
- Randall's Facebook page belongs to her, not the County;[5]
- Every decision about Randall's Facebook page is made by her alone;[6]
- Randall uses only personal (not County) equipment to maintain and operate her Facebook page;[7]
- The decision to implement the 12-Hour ban was made by Randall alone, without consulting any government employee, "unilateral[ly]" and "in the heat of the moment;"[8]
- No County policy played any role in Randall's decision to ban Plaintiff; and[9]
- The ban was effectuated by Facebook, at Randall's request, by virtue of a private agreement between her and Facebook.

Confronted with this evidence, the District Court recognized "there are some indications" that Randall's Facebook page "is entirely private." Mem. of Dec. at 15. The District Court had also observed in a pre-trial order about Randall's Facebook page that she "has made a significant effort to keep it from entanglement with the County government." May 10, 2017 Mem. Op. at 18.

Despite these facts, the District Court, looking at the "totality of the circumstances" (Mem. of Dec. at 15, 22), ruled that Randall "acted under color of

---

[4] Trial Tr. 109:25; *id*. at 176:16-19.
[5] Trial Tr. 183:12-17.
[6] Trial Tr. 82:3-4; *id*. at 223:4-6.
[7] Trial Tr. 112:2-8; *id*. at 179:10-180:2; *id*. at 194:11-18.
[8] Mem. of Dec. at 23.
[9] Mem. of Dec. at 23.

state law here, both in maintaining her [] Facebook page generally, and in taking the specific action of banning Plaintiff from that page."  Mem. of Dec. at 14-15. That determination was wrong as a matter of law, and clearly erroneous as to the facts.

When she temporarily banned Plaintiff's "Virginia SGP" persona from commenting on her Facebook page, Randall did not exercise power "possessed by virtue of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) ("[T]he deprivation must be caused by the exercise of some right or privilege created by the State . . . .").  The District Court acknowledged this in a pretrial order, finding that Randall did not "exercise[] power" she had by virtue of state law (May 10, 2017 Mem. Op. at 22)—later contradicting that finding post-trial.

In finding Randall acted under color of state law, the District Court relied heavily on this Court's decision in *Rossignol v. Voorhaar*, 316 F.3d 516 (4th Cir. 2003).  Yet this case bears little resemblance to *Rossignol*.  For example, in *Rossignol* the Defendants "retaliate[d] against those who questioned their fitness for public office and who challenged many of them in the conduct of their official duties." *Id*. at 523.  Here, the aspect of the comment which led to the 12-Hour ban was not about Randall at all (it was about the School Board and family

5

members)—let alone about her conduct as a public official. *See* Mem. of Dec. at 25 (comment was "about the conduct of School Board officials, alleging conflicts of interest involving their family members"). And, unlike here, in *Rossignol*, the defendants' "status as sheriff's deputies enabled them to execute their scheme in a manner that private citizens never could have." *Id*. at 526. Here, Randall's authority and ability to impose the 12-Hour ban did not depend in *any way* on Randall's office or status as a public official.[10]

Because Randall did not act under color of state law, Plaintiff's First Amendment claim, brought pursuant to 42 U.S.C. § 1983, must be rejected.

## III. Randall Did Not Violate the First Amendment or Article I, § 12 of the Virginia Constitution

The District Court also determined that Randall's actions violated the First Amendment of the United States Constitution and Article I, § 12 of the Constitution of Virginia. (Mem. of Dec. at 2).[11] Although Randall's management of her own Facebook page is not properly viewed as state action, and therefore

_____

[10]  Plaintiff acknowledged he had been banned from the pages of private citizens. *See* Dkt. 97-8 at 15-16 (Plaintiff Brian C. Davison's Responses to Defendants' First Interrogatories).

[11]  The District Court found for purposes of this case that the rights conferred by the First Amendment and Article I, § 12 of the Virginia Constitution are coextensive. Mem. of Dec. at 22; May 10, 2017 Mem. Op. at 8. Plaintiff agreed. *See* Dkt. 119 at 11 (Plaintiff's Proposed Legal Conclusions, calling federal and state rights "coextensive"). For purposes of this appeal, Randall does not dispute that conclusion. However, Section 1983 does not provide a cause of action for violations of state constitutional rights, and to the extent the District Court's declaratory relief was based on an alleged violation of state law that was erroneous. For convenience, in this brief references to and arguments about the First Amendment also apply to Plaintiff's claim based on Article I, § 12 of the Virginia Constitution.

should not be subject to First Amendment scrutiny, assuming arguendo that her actions were governed by the First Amendment, Plaintiff did not sustain a First Amendment violation, and the District Court's contrary determination was erroneous.[12]

### A.     Randall's Facebook Page Is Not a "Public Forum"

The District Court determined that Randall's Facebook page, "as presently constituted operates as a [public] forum for speech."  Order at 1; Mem. of Dec. at 25-27.  That determination—a cornerstone of the District Court's decision, Order and Judgment—was erroneous, for several reasons.

First, the public forum doctrine is a rule governing claims of "a right of access to *public* property."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983) (emphasis added); *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250 (2015) ("forum analysis" used to evaluate speech "on government property"); *International Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 681 (1992) (finding evidence of expressive activity at privately owned sites "irrelevant to *public* fora analysis"); *see also Minnesota State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 280 (1984)

---

[12]   The District Court supported its conclusion that Randall used "County Resources to support" her Facebook page by claiming "[m]ost notably" that Randall's eventual Chief of Staff "helped to create the page."  Mem. of Dec. at 19.  But this was erroneous, and seemingly contradicted by the District Court's own finding that the page was created before Randall took office, and before her eventual Chief of Staff had assumed that position.  Mem. of Dec. at 4, Factual Finding 10.

(discussing what is required "for *government* property to be a public forum") (emphasis added). Here, however, at the urging of Plaintiff, the District Court applied the *public* forum doctrine to a *private* website: Facebook. Mem. of Dec. at 3-4, Factual Finding 9. Randall, Plaintiff, and other users access Facebook pursuant to private agreements between Facebook and each user. *See Terms of Service*, Facebook, https://www.facebook.com/terms.php; *Pages Terms*, Facebook, https://www.facebook.com/page_guidelines.php. Facebook imposes terms and conditions on users, which allow Facebook to remove content including comments posted by users. *See Terms of Service* ¶ 5.2, Facebook,, https://www.facebook.com/terms.php ("We can remove any content or information you post on Facebook if we believe that it violates this Statement or our policies.").[13] In fact, Plaintiff initially sued the County Board of Supervisors alleging it had unlawfully removed one of his comments, only to withdraw the unfounded claim when Facebook's lawyers explained that Facebook had removed his comments based on its own policies.[14]

---

[13] Facebook has its own First Amendment rights, which may protect its ability to remove or exclude from users' pages content the government could not categorically proscribe—*e.g.*, hate speech and other offensive speech. *See Community Standards*, Facebook https://www.facebook.com/communitystandards ("To help balance the needs, safety, and interests of a diverse community, however, we may remove certain kinds of sensitive content or limit the audience that sees it.").

[14] *See* Dkt. 76 (Parties' Joint Stipulation of Facts).

8

Second, the history of the Supreme Court's First Amendment jurisprudence is "one of continual development" and the Court has explained it is "wary of the notion that a partial analogy in one context, for which we have developed doctrines, can compel a full range of decisions in such a new and changing area." *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 740, 749 (1996); *id*. at 749 (determining it would be "unwise" to decide whether and how to apply public forum doctrine). The District Court itself believed this case presented "novel" legal questions. Mem. of Dec. at 14; *see also* May 10, 2017 Mem. Op. at 20 ("When a social media website may be considered 'governmental' for purposes of the First Amendment, notwithstanding that it is controlled privately by a government official, appears to be a novel legal question. There is, to the Court's knowledge, no existing legal framework that can readily supply an answer."). These considerations should have led the District Court to recognize that a public forum doctrine developed for other circumstances was a poor fit here.

Third, Plaintiff's complaint about the 12-Hour ban was that his comments could not be seen by people *other than Randall*.[15] But there is no evidence that Randall established her Facebook page so that other people could communicate

---

[15] *See* Dkt. 97-10 at (Davison Dep. Tr. at 81:9-19) ("I'm not alleging any right to petition Ms. Randall. I know how to communicate with Ms. Randall. I know where to find her. I can send e-mails. I can send mail. I can do everything . . . . [T]he way to change the policy is to . . . put public pressure on them by making people aware of what they're doing and/or inform people so that they would vote her out.").

*with one another*.  Her Facebook page was primarily a vehicle for her own speech—and secondarily for people to speak *to her*.  This too rendered the public forum analysis a poor fit here.

Fourth, although Plaintiff uses the phrase "public forum" as a mantra, he effectively acknowledged Randall's Facebook page is not, conceding: "[S]he doesn't have to allow anybody to comment on her page at all.  I'm not disputing that at all."  Trial Tr. 63:1-3.  And he conceded that Randall could remove comments that could be offensive—for example "a cuss word."  Trial Tr. at 240:20-24.  *Cf. United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 204 (2003) (rejecting application of public forum analysis to public library's decision about what private speech to make available to the public).

Finally, Randall is unaware of any case where a public employee acting in his or her individual (not official) capacity unilaterally created a public forum— and neither Plaintiff nor the District Court cited any such case in the proceedings below.[16]

---

[16]  The District Court's reliance on *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) was misplaced.  *Packingham* concerned a First Amendment challenge to a criminal law prohibiting registered sex offenders from accessing "a commercial social networking Web site."  *Id.* at 1733.  The decision had nothing to do with what the issues presented here.

**B.    The 12-Hour "Ban" Was Not "Viewpoint Discrimination"**

After concluding Randall's Facebook page was a public forum, the District Court next concluded that Randall "engaged in viewpoint discrimination by banning Plaintiff[17] from her Facebook page." Mem. of Dec. at 27. However, that determination too was erroneous.

The 12-Hour ban followed Randall's removal of one of her own posts in response to which Plaintiff had posted his own comment on her Facebook page. Randall's removal of her own post had the effect of removing all comments to that post, including Plaintiff's. Before the District Court, however, Plaintiff expressly and repeated disclaimed any challenge to the removal of any of his comments from Randall's Facebook page.[18] His claim, instead, was predicated *solely* on his alleged inability to post *new* comments on Randall's Facebook page during the 12-Hour ban.[19]

---

[17] As explained below in Section II.C., Randall banned "Virginia SGP"—not Plaintiff. The District Court erred in not recognizing that distinction.

[18] Trial Tr. 7:9-12 ("I'm not alleging that she deleted comments. She has the right to delete her post and my comment with it, so that's not before the Court."); *id*. at 63:1-3 ("[S]he doesn't have to allow anybody to comment on her page at all. I'm not disputing that at all."); *id*. at 237:20-23 ("Court: So you're not complaining about the deletion?; A: Correct. I assert that she has the right to remove it, all the content on her page."); *id*. at 245:2-3 ("like I said, she could filter the comments").

[19] Plaintiff consistently alleged the 12-Hour ban was unlawful "prior restraint." *See*, *e.g.*, Trial Tr. at 6:15; 7:14; *id*. at 238:1-15. But there was no prior restraint, and the District Court neither addressed nor accepted that argument in its Memorandum of Decision.

11

Viewpoint discrimination occurs when "the government targets not subject matter, but particular views taken by speakers." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The District Court found that Randall "banned Plaintiff from her Facebook page because she was offended by his criticism of her colleagues in the County government" (Mem. of Dec. at 13, Factual Finding 39)—and deemed that viewpoint discrimination. But the evidence shows otherwise.

The 12-Hour ban resulted from Randall determining she did not want on her Facebook page discussion about the *subject* of "people's family members"— whether true or false—particularly because they seemed to her "fairly personal in nature" and "slanderous." Mem. of Dec. at 13, Factual Finding 38; *id*. at 28-29; Trial Tr. at 191:1-23; *id*. at 213:14-17.[20] That is not viewpoint discrimination. And there is no evidence that Randall's decision was driven by disagreement with or dislike for Virginia SGP's *views*.[21]

---

[20] Plaintiff did not retain a copy of the comment by "Virginia SGP" which led Randall to ban "Virginia SGP" from making further comments overnight. Nor did Plaintiff adduce evidence from any other source of the comment's precise content. Therefore, all testimony about the comment was based solely on the memory of Plaintiff and Randall. *See* Mem. of Dec. at 25; Trial Tr. at 53:15-16 (Plaintiff: "I don't remember the exact comments").

[21] The District Court's own factual findings are inconsistent with its conclusion that the 12-Hour ban was the result of viewpoint discrimination. For example, the District Court noted that Randall recalled Plaintiff's comment "included allegations of corruption" by the County School Board and conflicts of interest among the School Board and their family members. Mem. of Dec. at 12, Factual Finding 36. Randall did not disagree with the veracity of Plaintiff's comment—she had "no idea" whether his allegation was well-founded. *Id*. at 12, Factual

### C.    "Virginia SGP"—Not Plaintiff—Was Temporarily Banned

During the time relevant to this case, Plaintiff maintained at least two Facebook profiles: (1) "Virginia SGP,"[22] and (2) "Brian Davison."  The exhibits used at trial reflect that Plaintiff used both to post comments about the County and about Randall—and he testified to that effect as well.  *See*, *e.g.*, Trial Tr. at 33:25-34:3 ("I made both comments.  One was from my -- Brian Davison, my personal account, my personal profile. The other one was post from the Virginia SGP.").

The comment on Randall's Facebook page that led to the 12-Hour ban was made by "Virginia SGP."  *See* Trial Tr. at 190:21-24; Mem. of Dec. at 12, Factual Finding 35.  And it was "Virginia SGP," *a Facebook account screen name*—not *Plaintiff*—that Randall temporarily banned.  At the time, Randall did not even know that "Virginia SGP" was related to Plaintiff.  Trial Tr. at 211:23-24 ("[Y]ou came on as Virginia SGP.  I now know that that's also Brian Davison.  I did not know that then.").

Plaintiff had at least one other Facebook "screen name" in use at the time—Brian Davison.  At trial Plaintiff did not present evidence that he was unable to post to Randall's Facebook page during the 12-Hour ban of "Virginia SGP" using

---

Finding 37.  But she determined that if the commenter—who had anonymously posted under the screen name "Virginia SGP"—"was the type of person that would make comments about people's family members then maybe I did not want [him] to be commenting on my site."  Trial Tr. 213:14-17.

[22]  Trial Tr. 22:15-16 (Virginia SGP is a "screen name" sometimes used by Plaintiff).

13

the "Brian Davison" screen name. Nor did Plaintiff present evidence that he tried and was unable to post comments to Randall's page during the 12-Hour ban using another Facebook account—whether previously established by him, a new account created by him, or an account borrowed from someone else.

Plaintiff's claim before the District Court was that he—**Brian Davison**—had his First Amendment rights violated by Randall during the 12-Hour ban. And although he has the burden of proof with respect to all issues, at trial Plaintiff failed to demonstrate anything more than the fact that his "Virginia SGP" screen name was subject to a temporary ban.[23] But there is no First Amendment right to post comments on Facebook using any particular screen name.[24]

### D.    Any First Amendment Impact Was *De Minimis* and Not Actionable

In addition to all of the foregoing reasons why there was no First Amendment violation, the District Court's Order and Judgment must be reversed because the evidence established there was—at most—a *de minimis* impact on Plaintiff's First Amendment rights.

The District Court itself determined that Randall's actions and any impact on Plaintiff were "relatively inconsequential as a practical matter." Mem. of Dec. at

---

[23] Plaintiff testified he had not previously posted comments to Randall's Facebook page. Trial Tr. 53:18-21.

[24] To the extent the District Court found that **Plaintiff** was banned by Randall, for the reasons explained in this Section, that finding was clearly erroneous.

14

2; *id.* at 30 ("Practically speaking, the consequences of Defendant's actions were fairly minor. The ban lasted a matter of hours, spanning only a single night. During that time, Plaintiff was able to post 'essentially the same thing on multiple pages.' Tr. 51. There is little indication that Plaintiff's message was suppressed in any meaningful sense, or that he was unable to reach his desired audience.").[25]

And, as the Supreme Court has explained, "[t]here is, of course a *de minimis* level of imposition with which the Constitution is not concerned." *Ingraham v. Wright*, 430 U.S. 651, 674 (1977); *see also Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006) ("[W]e have recognized a distinction between an adverse impact that is *actionable* . . . and a *de minimis* inconvenience.").

Based on the facts of this case, the limited impact on Plaintiff is simply not actionable.[26]

### E.    The District Court Paid Insufficient Attention to Randall's First Amendment Rights

It is beyond dispute that public employees have their own First Amendment rights, and "a citizen who works for the government is nonetheless still a citizen."

---

[25]  The ban did not impact Plaintiff's ability to see Randall's Facebook page—which he could at all times during the 12-Hour ban. *See* Mem. of Dec. at 13 & 14, Factual Findings 40 & 43. And during the 12-Hour ban Plaintiff "was able to post 'essentially the same thing on multiple pages." *See* Mem. of Dec. at 14, Factual Finding 43.

[26]  Randall did not post *anything* to her Facebook during the temporary ban: "I literally banned him before I went to bed that night and I woke up the next morning and I unbanned him." Trial Tr. 194:23-25. Plaintiff did not miss *any* opportunity to respond to any new posts while banned, because there were none.

*Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). In addressing the "novel" questions presented by this case, the District Court paid insufficient attention to the fact that Randall herself has First Amendment rights, which are themselves impaired by the District Court's decision.

The claim before this Court is Plaintiff's cause of action against Randall in her *individual* capacity only. While Randall's website may have discussed her activities as a governmental official, she was exercising her rights as a private citizen to discuss those activities. And part of what the First Amendment protects is a speaker's right to curate and exercise control over the content of its own publications. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974). Requiring Randall to leave comments on her own website written by someone else, over her own wishes and objections, is a form of compelled speech, itself prohibited by the First Amendment. *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 717 (1977) (recognizing a First Amendment right to "avoid becoming the courier for" an unwanted message).

Notably, Plaintiff appears to recognize Randall's First Amendment rights are implicated: he repeatedly conceded Randall has the right *to remove* comments after they are posted on her Facebook page.[27]

---

[27] *See supra* note 18.

16

**F.    If Randall's Actions Were State Actions, Then Her Facebook Page Is Government Speech Immune from First Amendment Scrutiny**

At trial, on two separate occasions, Plaintiff conceded that Randall's Facebook page can be viewed as government speech.  First, during cross-examination, he admitted: "she doesn't have to allow anybody to comment on her page at all.  I'm not disputing that at all.  *That's government speech*."  Trial Tr. at 63:1-4 (emphasis added).  Then, during closing arguments, he admitted that "if she chooses which comments that she wants, *that's government speech and she can do anything* that she can."  Trial Tr. at 241:7-9 (emphasis added).[28]

These concessions alone are dispositive, and grounds for vacating the Order and Judgment, because "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."  *Walker*, 135 S. Ct. at 2245.

Although the District Court erred in concluding that Randall acted under color of state law in connection with her Facebook page, if Randall's Facebook page was really a government Facebook page—as the District Court's holding that she was acting under color of state law seems to presume—then Plaintiff's First Amendment claim should have been rejected on the ground that the government's

---

[28]    Plaintiff made the same concession in his proposed conclusions of law.  Dkt. 119 at 10 (Randall's Facebook page "represents government speech under the sole discretion of Defendant Randall").

17

exercise of editorial control over its own publications are not subject to First Amendment limitations.

## IV.   The District Court Erred in Granting Declaratory Relief

The District Court also erred in issuing a declaratory judgment in favor of Plaintiff—regardless of the merits of his First Amendment claim.

Declaratory judgments can operate retrospectively or prospectively. *PeTAv. Rasmussen*, 298 F.3d 1198, 1202 n.2 (10th Cir. 2002); *see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002); *Green v. Mansour*, 474 U.S. 64, 72-74 (1985). Here, Plaintiff's request for a declaratory judgment should have been rejected either way. To the extent the declaratory judgment at issue operates *prospectively*, Plaintiff lacked Article III standing to seek prospective relief.[29] To the extent that the declaratory judgment operates *retrospectively*, the District Court abused its discretion by permitting an unlawful end-run around the legal immunities to which Randall is entitled.

### A.   To the Extent the Declaratory Judgment Operates Prospectively, It Must Be Reversed Because There Was No "Actual Controversy" Necessary for the District Court's Jurisdiction

The Declaratory Judgment Act does not expand the jurisdiction of the federal courts; it only provides an additional remedy in cases of "actual

---

[29]  Plaintiff's operative complaint asked ***only*** for prospective relief: "It is also prayed that the Court issue a declaratory judgment finding Defendant Randall's blocking *future* Plaintiff comments . . . violated the Plaintiff's First Amendment free speech rights." Dkt. 14-1 at 9-10; Dkt. 33 at 8 (emphasis added).

18

controversy" already within their jurisdiction.  28 U.S.C. § 2201(a); *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950).  The Act is thus "operative only in respect to controversies which are such in the constitutional sense." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937).  In order to establish such a "controvers[y] . . . in the constitutional sense," a plaintiff must first have standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.").  And "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

Here, both Plaintiff's own words and the District Court's findings confirm there was no ongoing or imminent injury sufficient to confer standing to seek prospective relief.  For example, in seeking leave to amend his complaint to add the cause of action now before this Court on appeal, Plaintiff explained he initiated his suit without a claim against Randall because she "unblocked [Plaintiff] within days" and "such a claim might be ruled moot by the Court."  Dkt. 14 at 3.  More than seven months after the 12-Hour ban had ended, however, Plaintiff reconsidered, concerned that Randall "*may* block the Plaintiff in the future."  *Id*. at 4 (emphasis added).  And, as the District Court observed: "Plaintiff's access to Defendant's . . . Facebook page was restored *long before* Plaintiff commenced this

19

action.  Since that time, Plaintiff has enjoyed uninterrupted use of Defendant's Facebook page."  Mem. of Dec. at 41 (emphasis added).  Given this, it is unsurprising that the District Court made no findings demonstrating a likelihood that Plaintiff would suffer *any* future injury.

The Supreme Court has made clear that "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).  A prospective declaratory judgment issued in the absence of any plausible allegation of future injury is nothing more than an impermissible advisory opinion.  *See United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947) ("As is well known the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.  For adjudication of constitutional issues 'concrete legal issues, presented in actual cases, not abstractions' are requisite.  This is as true of declaratory judgments as any other field.").

Because Plaintiff lacked standing to seek prospective declaratory relief, the Order and Judgment must be reversed to the extent it operates prospectively.[30]

---

[30] It was also an error to enter a *prospective* declaratory judgment predicated on how Randall's Facebook page is "presently constituted" (Order at 1)—which is necessarily subject to change. Such a *prospective* declaratory judgment is inherently advisory.

20

**B.  To the Extent the Declaratory Judgment Operates Retrospectively, it Must Be Reversed Because Randall Is Entitled to Qualified Immunity[31]**

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).  A court evaluating a qualified immunity defense must "look not to whether the right allegedly violated was established 'as a broad general proposition' but whether 'it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted.'" *Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)).

Whatever the merits of Plaintiff's First Amendment arguments, the right articulated by the District Court below was not "clearly established" when the events giving rise to this lawsuit occurred.  The District Court seems to have made this point itself, calling the legal issues presented "novel."  Mem. of Dec. at 14.

---

[31]  The District Court rejected "Plaintiff's free speech claims against Defendant in her official capacity."  Mem. of Dec. at 24.  Had he not, to the extent the declaratory judgment is understood as retrospective in nature it would be barred by the Eleventh Amendment.  "[A] request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred."  *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 55-56 (4th Cir. 2011).  A plaintiff therefore may not use a declaratory judgment action to make a "partial 'end run'" around an independent bar to relief that would have "much the same effect."  *Green*, 474 U.S. at 73.

Randall asserted qualified immunity,[32] and her entitlement to it does not change merely because Plaintiff omitted a request for damages in his complaint. To escape this conclusion, the District Court relied on the general proposition that "[c]laims for declaratory and injunctive relief are not affected by qualified immunity." *Lefemine v. Wideman*, 672 F.3d 292, 303 (4th Cir. 2012), *vacated and remanded*, 568 U.S. 1 (2012) (per curiam).  But that categorical proposition is not supported by Supreme Court decisions.[33]  It is also in direct tension with the principles announced in *Green*, 474 U.S. at 72-74, as followed by this Court in *Manning v. S.C. Dep't of Highway & Pub. Transp.*, 914 F.2d 44 (4th Cir. 1990), that courts should not permit "end-runs" around immunity doctrines by way of the Declaratory Judgment Act. *See also CGM, LLC*, 664 F.3d at 55-56 ("[A] request

---

[32]  *See* Dkt. 36 at 11 ("As to any individual capacity claim . . . Randall is entitled to qualified immunity"); Dkt. 47 at 4 ("Randall reiterates the argument that she is entitled to qualified immunity."); Jan. 4, 2017 Mem. Op. at 18; Dkt. 59 at 5 (Randall "states affirmatively that she is entitled to qualified immunity"); May 10, 2017 Mem. Op. at 23. *See also* Va. Code § 15.2-1405. However, the District Court denied Randall's request for summary judgment based on qualified immunity because Plaintiff "does not seek civil damages." May 10, 2017 Mem. Op. at 23-24.

[33]  It is true the Supreme Court frequently recites the principle that qualified immunity applies to damages actions. *See, e.g.*, *Reichle v. Howards*, 566 U.S. 658, 664 (2012) ("Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."). But a careful reading of the Supreme Court's decisions makes clear that description of qualified immunity is a minimum, not a maximum. In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the progenitor of modern qualified immunity doctrine, the Supreme Court expressly reserved judgment on the availability of qualified immunity in actions for injunctive or declaratory relief, confining its decision that day to actions for damages only. *Harlow*, 457 U.S. at 819 n.34 ("We emphasize that our decision applies only to suits for civil *damages* . . . . We express no view as to the conditions in which injunctive or declaratory relief might be available."). Randall is aware of no Supreme Court decision holding that qualified immunity is never available in a suit for declaratory relief.

22

for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred.").

The *Lefemine* Court supported its broad conclusion that declaratory and injunctive relief are *never* subject to qualified immunity, by overreading this Court's holding in *Roller v. Cavanaugh*, 984 F.2d 120 (4th Cir. 1993), *overruled in part on other grounds, California Dep't of Corr. v. Morales*, 514 U.S. 499 (1995). In *Roller*, this Court confronted a request for only prospective declaratory and injunctive relief, and explained that "[b]ecause . . . *prospective* relief to stop unconstitutional practices by states is available in federal courts, Roller's claims for declaratory and injunctive relief are not affected by the defendants' immunities." *Roller*, 984 F.2d at 122 (emphasis added) (internal citation omitted). The *Roller* Court thus relied on the correct distinction: not between suits for damages and suits for declaratory or injunctive relief, but between suits for *retrospective* relief (where qualified immunity is available) and suits for *prospective* relief (where it is not). *Id.*[34]

Categorically refusing to apply qualified immunity to a request for a retrospective declaratory judgment would also conflict with the basic purposes

---

[34] That approach is supported by the Supreme Court's decisions in related contexts. *See*, *e.g.*, *Verizon Md., Inc.*, 535 U.S. at 645; *Pulliam v. Allen,* 466 U.S. 522 (1984); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105-06 (1984) (discussing *Edelman v. Jordan*'s "distinction between prospective and retroactive relief").

underlying the doctrine. The "conception animating the qualified immunity doctrine" must account for the "general costs of subjecting officials" to litigation: "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Mitchell v. Forsyth*, 472 U.S. 511, 525-26 (1985) (quoting *Harlow*, 457 U.S. at 816). The social costs of subjecting a public official in Randall's position to extended, expensive, and distracting litigation did not disappear simply because Plaintiff did not seek damages. Here, Randall had to endure discovery, motions practice and trial—just as she would have to had a damages claim been asserted.

This Court should reverse the Order and Judgment and hold that Randall enjoys qualified immunity from a claim for retrospective declaratory relief.

## STATEMENT REGARDING FORMAL BRIEFING AND ORAL ARGUMENT

This appeal involves important, novel questions of First Amendment law, along with questions of the proper scope of qualified immunity and the availability of a declaratory remedy. Given the importance of the issues involved, some or all of which are questions of first impression in this Circuit, Randall believes that formal briefing and oral argument would be beneficial to the parties and the Court.

## **CONCLUSION**

For the foregoing reasons, the District Court erred in entering the parts of the Order (Dkt. 133) and Judgment (Dkt. 134) in favor of Plaintiff and against Defendant—and they should be reversed, and judgment should be entered for Randall with the respect to Plaintiff's claims.[35]

Respectfully submitted,

Dated: November 3, 2017       /s/ Scott E. Gant

Scott E. Gant
Aaron E. Nathan
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
(202) 237-2727
sgant@bsfllp.com

*Counsel for Defendant-Appellant*
*Phyllis Randall*

---

[35] This Informal Opening Brief does not address any issues which may be raised by Plaintiff on cross-appeal, because those issues are presently unknown. Randall does not waive, and reserves the right to make, any argument in response to Plaintiff's cross-appeal.

25

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g)(1) and Local Rule 34(b), I certify that this brief complies with the type-volume limitation required by Fed. R. App. P. 32(a)(7)(B)(i) because it contains 6,390 words, excluding the parts exempted by Fed. R. App. P. 32(f), as determined by the word count function of Microsoft Word. I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Times New Roman font using Microsoft Word.

November 3, 2017           /s/ Scott E. Gant           

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Fed. R. App. P. 25(c), I certify that the foregoing was electronically filed with the Clerk of Court on November 3, 2017 using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system and to the *pro se* Plaintiff-Appellee, who has received leave to participate in electronic filing.

November 3, 2017                       /s/ Scott E. Gant